# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

MARGERY KAIN,
          Plaintiff

v.

LIBERTY MUTUAL GROUP INC.,
          Defendant

C.A. NO. 22-10436-DPW

**LEAVE TO FILE
GRANTED BY ORDER DATED
DECEMBER 5, 2022**

## THIRD AMENDED COMPLAINT AND JURY DEMAND

### PARTIES

1. Plaintiff Margery Kain is a resident of Boston, Suffolk County, Commonwealth of Massachusetts.

2. Defendant Liberty Mutual Group Inc. ("Defendant") is a corporation organized under the laws of the Commonwealth of Massachusetts, having a usual place of business in Boston, Suffolk County, Commonwealth of Massachusetts.

### FACTUAL ALLEGATIONS

3. Plaintiff is a white female, over the age of 50. The United States of America is her country of national origin.

4. Starting on or about March 13, 2000, until it fired her on September 9, 2022, Defendant employed Plaintiff at its Boston headquarters as a "Senior Executive Assistant I" (hereinafter, "EA").

5.  This job required Plaintiff to provide support to high level executives, classified as "L2s".

6.  Most recently, Plaintiff performed this work for the L2 in charge of Defendant's Global Employees Experience Office, one Enrique Huerta. Throughout her employment, Plaintiff met or exceeded the performance expectations of her job.

7.  In or about October 2020, Defendant notified Mr. Huerta that it was relocating him from its Boston office to Spain.

8.  In or about this time, Defendant offered Plaintiff and certain other employees an early retirement option ("ERO").

9.  Plaintiff did not elect to accept the ERO based on Mr. Huerta's representations, in or about October 2020 and January 2021, that she would continue in her role as his EA.

10. In late February 2021, Defendant evaluated Plaintiff's job performance for the previous year as exceeding expectations.

11. Despite this, Plaintiff was informed that because her pay grade had reached the maximum level (13), she was not eligible for a raise. She was further informed, however, that Mr. Huerta had succeeded in getting special permission for her to receive a $350.00 annual increase.

12. On or about April 9, 2021, Defendant informed Plaintiff and similarly situated EAs that their job titles would be changed to align with their "grade levels." Plaintiff and the other EAs were further informed that EAs, like Plaintiff, who had reached

the highest pay grade level for supporting L2s (13), would never be eligible for raises.

13. Plaintiff raised her objections about Defendant's policy to Mr. Huerta. After speaking with Defendant's HR department, Mr. Huerta told Plaintiff that HR had confirmed that Plaintiff and similarly situated employees could not ever receive raises.

14. In or about August 2021, Plaintiff was informed that she was being removed from her assignment with Mr. Huerta, and reassigned with other EAs to the "Procurement" department.

15. Subsequently, Plaintiff was informed that L2s would not be assigned to one EA, but would "pair up" and share an EA. EAs not so assigned were to be placed in a "pool" covering L2s and L3s. Plaintiff was re-assigned to covering three L3s from the Global Employee Team and one L3 and two L4s from the Sustainability Team.

16. Plaintiff subsequently learned that Defendant had selected one Tonya Gloria as the EA assigned to the new L2 pairing of Mr. Huerta and one Dawn Frazier Bohnert, the L2 in charge of Diversity, Equity, and Inclusion ("DEI").

17. Ms. Gloria's qualifications to replace Plaintiff in this position or to be selected for it instead of Plaintiff were objectively inferior to Plaintiff's, including with respect to her experience working for Defendant, working for Mr. Huerta, and by their previously recorded employee evaluations, in which Plaintiff scored higher than Ms. Gloria.

18. Ms. Gloria, however, is significantly younger than Plaintiff, and identifies as Latino, whereas Plaintiff is a white person born and raised in Boston.

19. Defendant based its decision to assign Ms. Gloria to the EA job with Mr. Huerta and Ms. Bohnert, instead of Plaintiff, because of age, race, and national origin, and not a fair, non-discriminatory evaluation of Plaintiff's and Ms. Gloria's actual qualifications for the job.

20. On or about October 4, 2021, Plaintiff objected to Brett Trainor, her new manager, about the adverse actions described above, and then on that same day and then on October 12, 2021, to Amber Bonlie, of Defendant's HR department.

21. On October 14, 2021, Plaintiff had a subsequent conversation in which she objected to her illegal treatment to Marisa Ghiorzi, also an HR representative.

22. Ghiorzi criticized Plaintiff for the "tone" of her objections.

23. Defendant's employment of Plaintiff is covered by the minimum wage and overtime requirements of the Fair Labor Standards Act, 29 U.S.C. § 206 and § 207 ("the FLSA"), and the Massachusetts Overtime Law, G.L. c. 151, § 1A ("the Massachusetts Overtime Law").

24. The overtime requirements of the FLSA and Massachusetts Overtime Law require covered employers to pay their covered employees at 1.5 times their "regular rate of pay" for all hours they are required or permitted to suffer work in excess of 40 hours worked in their regularly recurring seven-day workweeks. 29 U.S.C. § 207(a)(1).

25. Under Massachusetts law, "working time" includes "all time during which an employee is required to be on the employer's premises or to be on duty, or to be at the prescribed work site, and any time worked before or beyond the end of the normal shift to complete the work." 455 C.M.R. § 2.01.

26. Under Massachusetts law, a deduction of time for a meal break is only permissible if an employee is relieved all work-related duties during the so-called meal break. If the employee is not relieved of all work-related duties, the meal break has to be paid.

27. Defendant's employment of Plaintiff throughout this time has also been subject to the Massachusetts Wage Act, G.L. c. 149, § 148 ("the Wage Act"), which requires a covered employer to pay its employees all their earned wages within no less than six days after the termination of their regularly recurring pay periods.

28. From on or after March 22, 2019 until it fired her, Defendant, by its agents, scheduled Plaintiff to work Monday to Friday, from 8:00 a.m. to 5:00 p.m., in a regularly recurring seven-day workweek between Sunday and Saturday.

29. During this time, Defendant, by its agents, including Mr. Huerta, knowingly required or permitted Plaintiff to work both before and after 8:00 a.m. and 5:00 p.m., and on weekends, but didn't count this time as compensable time worked in calculating straight time or overtime wages due Plaintiff.

30. The work Mr. Huerta required Plaintiff to perform on and off-the-clock frequently involved his personal affairs, including but not limited to setting up garbage collection for his home in Wellesley; setting up dry-cleaning delivery to his

home and registering his complaints about the service with the dry cleaner; registering Mr. Huerta's children for school enrollment; dealing with IKEA customer service over Mr. Huerta's complaints about furniture he had purchased; making medical appointments for Mr. Huerta, Mr. Huerta's spouse and other family members; and planning and coordinating Mr. Huerta's family vacations in Cape Cod, New York City, Maine, and Altantis.

31. Indeed, as a practice, Plaintiff and other EAs are expected by Defendant to perform personal chores for the executives to whom they are assigned and are entrusted with executives' personal credit card and other information in order to carry out these chores.

32. During Plaintiff's employment, Defendant had no policy in place restricting when an executive like Mr. Huerta could call on Plaintiff or other EAs to perform business-related work or personal services, and correspondingly, Mr. Huerta and other executives observed no constraints in ordering Plaintiff and other EAs to perform work for them outside their regularly scheduled hours of work.

33. In addition to considering the work Plaintiff performed outside of 8:00 a.m. to 5:00 p.m. Monday through Friday as non-compensable off-the-clock work, from on or after March 22, 2019 to the present, Defendant uniformly considered one-hour of Plaintiff's daily work schedule to comprise an unpaid "lunch break," despite the knowledge of its agents, including Mr. Huerta, that Plaintiff:

34. performed work throughout her 8:00 to 5:00 p.m. work day, and did not take uninterrupted lunch breaks of one hour in which she performed no work;

35. was required to perform work or required to be ready to perform or suffer work throughout her 8:00 a.m. to 5:00 p.m. work day, without regard to any supposed one hour lunch break;

36. was never fully relieved of all work-related duties for any period during her 8:00 a.m. to 5:00 p.m. work day, let alone for one hour each day, including because Plaintiff was always required, at all times during her work day, to remain available to immediately respond to and perform work for her superiors, including Mr. Huerta.

## COUNT I
## VIOLATION OF THE FLSA-FAILURE TO PAY OVERTIME
### Violation of 29 U.S.C. § 207(a)(1)

37. Plaintiff incorporates by reference all allegations made herein.

38. For all hours of work performed in excess of 40 in a regularly recurring seven-day workweek, the § 207(a)(1) of the FLSA requires a covered employer to pay an employee at an overtime rate of pay that is not less than one and one-half [i.e. 1.5] times the regular rate at which the employee is employed.

39. The FLSA and its overtime requirement covered Defendant's employment of Plaintiff.

40. In violation of the FLSA, Defendant did not pay Plaintiff 1.5 times her regular rate of pay for the hours she worked in excess of 40 in her regularly recurring seven-day workweeks, including because it did not count as compensable time worked in computing overtime due Plaintiff: (1) the work Plaintiff performed "off the clock"; or (2) the one hour each day it illegally deemed as an unpaid, one-hour lunch break.

41. Plaintiff has suffered harm, injury and damages due to Defendant's illegal acts, including in that she was not paid overtime wages due and owing to her under the FLSA.

42. Plaintiff has previously filed an FLSA Consent Form in this action authorizing this suit under 29 U.S.C. § 216(b).

**COUNT II**
**FAILURE TO PAY OVERTIME**
**Violation of G.L. c. 151, § 1A**

43. Plaintiff incorporates by reference all allegations made herein.

44. For all hours of work performed in excess of 40 in a regularly recurring seven-day workweek, the Massachusetts Overtime Law requires a Massachusetts employer to pay an employee at an overtime rate of pay that is not less than one and one-half [i.e. 1.5] times the regular rate at which the employee is employed.

45. The Massachusetts Overtime law covered Defendant's employment of Plaintiff.

46. In violation of the Massachusetts Overtime Law, Defendant did not pay Plaintiff 1.5 times her regular rate of pay for the hours she worked in excess of 40 in

her regularly recurring seven-day workweeks, including because it did not count as compensable time worked in computing overtime due Plaintiff: (1) the work Plaintiff performed off-the-clock; or (2) the one hour each day it deemed as an unpaid, one-hour lunch break.

47. Plaintiff has suffered harm, injury and damages due to Defendant's illegal acts, including in that she was not paid overtime wages due and owing to her under the Massachusetts Overtime Law.

## COUNT III
### Race Discrimination-Adverse Employment Action
### Violation of G.L. c. 151B

48. Plaintiff incorporates by reference all allegations made herein.

49. Defendant's employment of Plaintiff was subject to the Massachusetts Fair Employment Practices Law, G.L. c. 151B.

50. It is unlawful under G.L. c. 151B for an employer to discriminate against an employee in the terms and conditions of the employee's employment on the basis of the employee's race.

51. Defendant, by its agents, discriminated against Plaintiff in the terms and conditions of her employment, on the basis of her race, by *inter alia* taking the following adverse actions against her:

52. demoting Plaintiff from her job as Mr. Huerta's EA;

53. not retaining or assigning Plaintiff as EA for Mr. Huerta and Ms. Bohnert; and

54. deliberately assigning Plaintiff to a job with diminished
responsibilities, and no opportunity for advancement or pay raises, to
humiliate and embarrass Plaintiff, thereby creating working
conditions so intolerable that Plaintiff would quit.

55. Defendant's illegal acts have caused Plaintiff to suffer harm, injury, and
damages.

56. Plaintiff has satisfied all administrative prerequisites to suit under G.L. c.
151B.

## COUNT IV
### National Origin Discrimination-Adverse Employment Actions
### Violation of G.L. c. 151B

57. Plaintiff incorporates by reference all allegations made herein.

58. It is unlawful under G.L. c. 151B for an employer to discriminate against an
employee in the terms and conditions of the employee's employment on the basis
of employee's national origin.

59. Defendant, by its agents, discriminated against Plaintiff in the terms and
conditions of her employment, on the basis of her national origin, by *inter alia*
taking the following adverse actions against her:

60. demoting Plaintiff from her job as Mr. Huerta's EA;

61. not retaining or assigning Plaintiff as EA for Mr. Huerta and Ms.
Bohnert; and

62. deliberately assigning Plaintiff to a job with diminished
responsibilities, and no opportunity for advancement or pay raises, to

humiliate and embarrass her, thereby creating working conditions so intolerable that Plaintiff would quit.

63. Defendant's illegal acts have caused Plaintiff to suffer harm, injury, and damages.

## COUNT V
### Age Discrimination-Adverse Employment Actions
### Violation of G.L. c. 151B

64. Plaintiff incorporates by reference all allegations made herein.

65. It is unlawful under G.L. c. 151B for an employer to discriminate against an employee in the terms and conditions of the employee's employment on the basis of the employee's age.

66. Defendant, by its agents, discriminated against Plaintiff in the terms and conditions of her employment, on the basis of her age, by *inter alia* taking the following adverse actions against her:

67. demoting Plaintiff from her job as Mr. Huerta's EA;

68. not retaining or assigning Plaintiff as EA for Mr. Huerta and Ms. Bohnert; and

69. deliberately assigning Plaintiff to a job with diminished responsibilities, and no opportunity for advancement or pay raises, to humiliate and embarrass her, thereby creating working conditions so intolerable that Plaintiff would quit.

70. Defendant's illegal acts have caused Plaintiff to suffer harm, injury, and damages.

## COUNT VI
## Illegal Retaliation-Adverse Actions on the Basis of Protected Internal Complaints
## Violation of G.L. c. 151B, § 4(4)

71. Plaintiff incorporates by reference all allegations made herein.

72. It is illegal under G.L. c. 151B for an employer, by its agents, to retaliate against an employee for opposing acts prohibited by G.L. c. 151B, including by opposing employment discrimination, or to subject an employee to a hostile work environment motivated by such retaliation.

73. Here, Ms. Ghiorzi, acting as an agent of Defendant, revealed her retaliatory animus toward Plaintiff, by criticizing Plaintiff's "tone" in objecting to Defendant's discriminatory personnel actions.

74. Defendant took adverse actions against Plaintiff because she opposed its discriminatory actions, including by permanently assigning her to a job with diminished responsibilities with no chance for advancement.

75. Plaintiff has been harmed, injured and damaged by Defendant's violation of G.L. c. 151B.

## ADDITIONAL ALLEGATIONS FOR POST-MCAD CHARGE AND POST-COMPLAINT PROTECTED ACTIVITY

76. Plaintiff incorporates by reference all allegations made herein.

77. On or about November 11, 2021, Plaintiff filed a Charge of Discrimination against Defendant with the Massachusetts Commission Against Discrimination ("MCAD") and the Equal Employment Opportunity Commission, alleging that Defendant discriminated against her on the basis of her race, national origin, and

age, in violation of G.L. c. 151B; the ADEA, 29 U.S.C. § 623; and Title VII, 42 U.S.C. § 2000e, and retaliated against her in violation of the anti-retaliation provisions of those laws, by making internal complaints of discrimination. Plaintiffs' Charge of Discrimination is attached hereto as Attachment A, and is hereby incorporated by reference.

78. By letter dated November 18, 2021, which is included with Attachment A, the MCAD notified Plaintiff, through her attorney, that Defendant "had been advised" that it was obligated to respond to Plaintiff's charge with a "position statement."

79. On or about January 11, 2022, Plaintiff received a communication from one Lauren Kasper of Defendant's Employee Relations team proposing that Plaintiff meet with her so that Kasper might "understand" Plaintiff's "perspective".

80. Plaintiff responded to Kasper by informing her that she was represented by counsel at the MCAD, and as such, "I insist that my attorney Daniel Rice (cc'd here) be part of any conversation with Liberty Mutual about my employment, in light of that fact," then adding: "If you would still like to have a meeting, I will work with Attorney Rice to find an agreeable date and time to participate."

81. Per the rules of the MCAD, Plaintiff's Charge of Discrimination included Plaintiff's attorney's Notice of Appearance, and an email from Plaintiff to Plaintiff's attorney in which Plaintiff affirmed her allegations under oath, showing Plaintiff's attorney's contact information.

82. Upon information and belief, as an administrative practice, when it serves Charges of Discrimination on employers, the MCAD includes the Complainant's attorney's notice of appearance ,and the affirmation email.

83. On January 14, 2022, Ms. Kasper responded to Plaintiff's request that her attorney be present for the meeting, without denying that Defendant had been served with the MCAD Charge, but by stating: "Courtney Evanchuk is one of Liberty Mutual's employment attorneys. Your attorney may contact her if he wishes to do so. Courtney's phone number is XXX-XXXX-XXXX and her email address is xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx."

84. At 1:25 p.m. on January 21, 2022, Ms. Kasper contacted Plaintiff again, insisting that Defendant had the right to interview her regardless of whether she was represented by counsel at the MCAD:

> I wanted to follow-up with you from my prior email. In response to the meeting I scheduled for 1/11/22, you indicated you wouldn't speak with me without your attorney present. However, given that you are a current employee of Liberty Mutual, we do not allow for an attorney to be included in employee relations conversations. I am requesting to speak with you because I understand you have raised concerns related to your employment and I would like to discuss your concerns with you in detail. If you decline to speak to me, I will have to proceed with the investigation of your allegations with the current information I have available to me. Please let me know if you are willing to speak with me and, if so, some dates and times that would work well for us to have a discussion next week.

85. Thereafter, at 3:27 p.m. on that same day, Plaintiff's counsel contacted Defendant's attorney, Attorney Evanchuk, and confirmed Plaintiff's previous

assertion to Ms. Kasper that Plaintiff was represented at the MCAD by counsel, that the matter was

> … pending at the MCAD, which the MCAD indicates has been served on Liberty Mutual, and for which a Position Statement is due from Liberty Mutual. Please be advised that in light of this fact, it is inappropriate for Liberty Mutual to be 'investigating' Ms. Kain's charges by interviewing Ms. Kain, without my presence, or for that matter, outside the rules the MCAD has in place for discovery. I am therefore advising Ms. Kain to decline Ms. Kasper's attempt to interview her. If you wish to discuss this matter with me, please call me at the number below.

86. At 5:03 p.m., Attorney Evanchuk replied to Plaintiff's counsel's email with the following:

> Thank you for your email. Our office has not to my knowledge received notice of Ms. Kain's charge. Would you kindly email me a copy of the charge at your convenience?
>
> Thank you also for confirming that you are directing your client not to participate in Liberty Mutual's investigation into her concerns, which the Company is conducting pursuant to its internal policy.

87. On January 22, 2022, Plaintiff's counsel emailed a copy of Plaintiff's Charge of Discrimination to Attorney Evanchuk.

88. On or about March 28, 2022, Defendant filed a Position Statement in response to Plaintiff's Charge of Discrimination with the MCAD, signed by Attorney Evanchuk as Defendant's attorney, but which, in contravention of the Rules and Regulations of the MCAD, is not subscribed under the pains and penalty of perjury by any representative of Defendant. *See* 804 C.M.R. § 1.05(8)(d)(1).

89. Upon information and belief, the MCAD notified Defendant of the requirement that its Position Statement be subscribed under the pains and penalties of perjury by a company representative in the package it served Defendant with Plaintiff's Charge of Discrimination.

90. On March 22, 2022, Plaintiff commenced this instant action against Defendant, alleging in Count I of her Complaint that Defendant had failed to pay her earned overtime wages mandated by the Fair Labor Standards Act, 29 U.S.C. § 207(a); in Count II that Defendant's failure to pay her earned overtime wages also violated the Massachusetts Overtime Law, G.L. c. 151, § 1A; and in Count III, that it failed to pay her earned wages on a timely basis, in violation of the Massachusetts Wage Act, G.L. c. 149, § 148. (Docket No. 1.)

91. On or about March 31, 2022, three days after Defendant filed its Position Statement, Plaintiff withdrew her Charge of Discrimination from the MCAD, so that she could amend her Complaint pending in this action to include her discrimination and retaliation claims.

92. On May 24, 2022, this Court allowed Plaintiff's motion for leave to amend her complaint in this action, and on that same day, Plaintiff filed her First Amended Complaint, which added the factual allegations and Counts related to the discrimination and retaliation charges she had made at the MCAD, including Count III-Race Discrimination; Count V-National Origin Discrimination; Count VII-Age Discrimination; and Count VIII-Retaliation in Violation of G.L. c. 151B. (Docket No.'s 5 and 6.)

93. On June 1, 2022 outside counsel for Defendant initiated contact with Plaintiff's counsel indicating that Defendant had authorized him to accept service pursuant to the "Waiving of Service" procedure set forth in Fed. R. Civ. P. 4(d).

94. Thereafter, the First Amended Complaint was served on Defendant pursuant to the waiver agreement, with the executed Waiver filed with this Court on June 3, 2022. (Docket No. 7.)

95. Following discussion between counsel in late July and early August 2022 in accordance with Local Rule 7.1(a)(2), counsel for Plaintiff agreed to amend the First Amended Complaint by eliminating Counts IV, VI, VIII, and X, alleging that Defendant had subjected Plaintiff to a "hostile work environment" on the basis of her race, national origin, age, and protected activity respectively.

96. Upon leave being granted by this Court on August 9, 2022, Plaintiff filed her Second Amended Complaint on August 9, 2022. (Docket No.'s 13 and 14.)

97. Plaintiff's Second Amended Complaint alleges that Defendant failed to pay Plaintiff overtime in violation of the FLSA (Count I) and G.L. c. 151A (Count II); and that it discriminated against her on the basis of her race (Count III), national origin (Count IV), and age (Count V), and in retaliation for her protected activity in opposing employment discrimination, in violation of G.L. c. 151B (Count VI). (Docket No. 14.)

98. Defendant filed its Answer to the Second Amended Complaint on August 23, 2022. (Docket No. 15.)

99. On August 22, 2022, at around 8:40 a.m., Tara Michalowski, a Senior Employee

Relations Consultant employed by Defendant contacted Plaintiff by email and told

her she had scheduled Plaintiff for a Microsoft Teams meeting that morning at

10:30 a.m.

100.    In the email, Ms. Michalowski stated the following:

> Hi Margery, I work in Employee Relations and am
> currently reviewing a matter that I believe you may be
> able to provide some insight into. I would like to take
> some time to discuss more detail related to the matter
> and your perspective. I look forward to speaking with
> you.

101.    That same morning, counsel for Plaintiff thereafter informed counsel

for Defendant about Ms. Michalowski's request:

> Hi, Ms. Kain got a notice this morning from Liberty
> Mutual Employee Relations to submit to an investigatory
> interview. Unless the interview/investigation can't in any
> possible way be not related to her claims- including in
> any manner in which she might respond to inquiries or
> information she might provide- this examination can't
> take place without my direct involvement. I am away on
> vacation at the moment, so I am not free to participate
> today. Could you please check in with Liberty and let me
> know what this is all about? (Also, please note that this
> same thing- attempt to contact Ms. Kain directly without
> my involvement- happened during the MCAD phase of
> this dispute, which Liberty's attorney apologized for.) For
> now, I am advising Ms. Kain to respond to  Liberty
> Employee Relations by informing it that I have reached
> out to you for clarification before she proceeds with the
> requested interview.

102.    In response, counsel for Defendant replied:

> I hope you are enjoying your time off.   With regard to the
> interview you mentioned, I can advise you that it is
> entirely unrelated to the claims Ms. Kain brings in this

case. Further, any interviews would be conducted by internal employee relations personnel, and not Liberty Mutual in-house (or external) counsel. As such, the Rules of Professional Responsibility do not require you to be contacted about this interview, or that you be present for it.

As I am sure you would find unsurprising, Liberty Mutual generally does not allow third parties, including personal counsel, to attend internal investigatory interviews. We hope that Ms. Kain participates in the interview, but if she chooses not to do so Liberty Mutual will not have the ability to consider any information she might offer regarding the subject matter of the interview, and will have to make any decisions without that information.

Please confirm whether Ms. Kain will participate in the interview. I am happy to discuss if you like.

103. Counsel for Plaintiff replied:

Mark, based on your rep Ms. Kain will make herself available. I'll have her contact ER and handle the scheduling from there. TY

104. In reliance on Defendant's assurance that Ms. Michalowski's meeting was "entirely unrelated" to the claims she had made in her lawsuit, Plaintiff met with Ms. Michalowski and Ms. Michalowski's assistant, one Krista Hertel, on August 23, 2022, by a video conference call.

105. At the outset of the meeting, Ms. Michalowski refused Plaintiff's request that she reveal the purpose of the interview, and Plaintiff's request she be permitted to record the interview. Ms. Michalowski also refused to provide Plaintiff with a reason for not allowing her to record the interview.

106.    At the outset of the interview, Plaintiff further related to Ms. Michalowski that she was concerned that the interview was related to her pending lawsuit against Defendant.

107.    In response to this expression of concern, Ms. Michalowski admitted she knew about Plaintiff's lawsuit, but parroting the representations made by Defendant's outside counsel by email the previous day, insisted that the interview was "entirely unrelated" to Plaintiff's lawsuit.

108.    Thereafter, Ms. Michalowski proceeded to begin referring to certain e-mails Plaintiff had sent from her company email, both by reading aloud selected excerpts of the emails, or by briefly displaying excerpts of the emails via screen sharing.

109.    As she referred to the emails, Ms. Michalowski accused Plaintiff of having committed acts of misconduct by their transmission.

110.    As an example of this, Ms. Michalowski accused Plaintiff of having committed misconduct  by having used her email to make a record of an e-mail she received from another EA, Valerie Mathis, in which Mathis had recorded the credit card number and other personal information of an executive, Rakhi Kumar- formerly assigned to Mathis but now to Plaintiff- so that Plaintiff could help Ms. Kumar, as Ms. Mathis had, with personal affairs Ms. Kumar had her EAs carry out for her, such as planning her vacations.

111.    Plaintiff responded to Ms. Michalowski's accusation that by pointing out that Kumar knew that Ms. Mathis- Ms. Kumar's previous EA- had provided

Plaintiff with this information to help her with her personal affairs, and frequently had Plaintiff access her information to help her with her personal matters.

112. As another example, Ms. Michalowski also accused Plaintiff of violating Defendant's workplace "violence" policy because in emails to coworkers, Plaintiff had complained that one of their managers was "nuts", that another was a "coward", and that Plaintiff had speculated to another coworker she would be forced to depart Defendant's employment in a "blaze of glory".

113. In response to Ms. Michalowski's accusations, Plaintiff related to Ms. Michalowski that she had shared her criticisms of her managers to her coworkers to object to the adverse working conditions to which the managers had subjected them, and that the words she used were not in any way violent.

114. With respect to her use of the phrase "blaze of glory", Plaintiff explained to Ms. Michalowski she used it to convey to her coworker that in light of her lawsuit, she predicted that Defendant would fire her for complaining about the unfair and illegal employment practices to which Defendant had subjected her and other EAs, including by not paying them their overtime.

115. Throughout the time Ms. Michalowski referred to the emails to accuse Plaintiff of misconduct, Plaintiff consistently responded by asking Ms. Michalowski to show her the entire emails to which she was referring and the email chains, and not just the excerpts, so that she could explain their context.

116. Ms. Michalowski refused to do this.

117.    Plaintiff also asked Ms. Michalowski if anyone employed by Defendant had complained about the contents of the emails.

118.    Ms. Michalowski refused to answer this question.

119.    At the end of the meeting, Ms. Michalowski ordered Plaintiff to destroy any of Defendant's documents that were in her possession.

120.    On September 8, 2022, Ms. Michalowski ordered Plaintiff to meet again with Ms. Hertel and her again.

121.     Ms. Michalowski once again proceeded to begin showing screenshots of email excerpts to Plaintiff, and demanded that Plaintiff admit sending them.

122.    As she had acknowledged sending the emails in the previous meeting, and Ms. Michalowski had refused to permit her to see the entire emails and email chains so that she might explain their context, Plaintiff told Ms. Michalowski that Defendant's motive for having curated the emails to make her look like she had committed misconduct was the plainly retaliatory one of inventing a reason to fire her for bringing her lawsuit against Defendant, and that she did not wish to proceed further.

123.    Ms. Michalowski ended the meeting.

124.    The next day, September 9, 2022, Ms. Michalowski called Plaintiff to another meeting by videoconference.

125.    With  Ms. Hertel once again present, Ms. Michalowski told Plaintiff that she was fired for being in violation of Defendant's "workplace safety policy".

126.    Ms. Michalowski added that Plaintiff wouldn't get any severance, and that her benefits would terminate as of midnight.

127.    Defendant's investigation of Plaintiff was not prompted by any legitimate concern about Plaintiff's conduct, and certainly not any legitimate concern or good faith conclusion that Plaintiff had committed any act comprising a threat of violence, workplace safety, or any breach of company protocol that actually prejudiced Defendant in any way, let alone one that would justify Defendant's termination of Plaintiff's employment after 22 years of unblemished service in which Plaintiff's performance was consistently ranked as exceeding expectations.

128.    To the contrary, Defendant, by its agents, investigated Plaintiff to establish an-after-the-fact legal defense for its illegally motivated decision to have replaced Plaintiff with Ms. Gloria, because Ms. Gloria's qualifications for the position were so objectively inferior to Plaintiff's, that Defendant, by its agents, realized it had no chance to convince any factfinder that it had a legitimate, non-discriminatory for replacing Plaintiff with Ms. Gloria, and therefore would be found liable for violating G.L. c. 151B, as Plaintiff alleged in her MCAD Charge and in this action.

129.    Defendant, by its agents, also investigated Plaintiff to contrive a basis to fire her, so that EAs similarly situated to Plaintiff would be in fear of joining Plaintiff in the claims she has made for unpaid overtime wages in this action under the FLSA and G.L. c. 151, in particular, because Defendant, by its agents, is aware

that due to its timekeeping practices and the behaviors of the high-ranking executives to whom Plaintiff and similarly situated EAs are assigned, it has no realistic defense to Plaintiff's off-the-clock work claims, nor would it of any similarly situated EAs.

130.    Defendant's agents' assertions that Ms. Michalowski's meeting with Plaintiff had nothing to do with Plaintiff's lawsuit were false.

131.    Indeed, but for Plaintiff's lawsuit, no investigation of Plaintiff's conduct ever would have been undertaken, and Plaintiff would not have been fired.

### COUNT-VII
### Retaliation in Violation of the FLSA, 29 U.S.C. § 215(a)(3)

132.    Plaintiff incorporates by reference all allegations made herein.

133.    It is illegal under the FLSA for an employer, by its agents, to take an adverse action against an employee for filing a complaint alleging a violation of the FLSA. 29 U.S.C. § 215(a)(3).

134.    By making claims under the FLSA in her Complaint, First Amended Complaint and Second Amended Complaint ("the complaints"), Plaintiff engaged activity protected by the FLSA.

135.    Defendant, by its agents, knew that Plaintiff engaged in this protected activity including because it was served with Plaintiff's complaints.

136.    On September 9, 2022, after it had been served with the complaints, Defendant, by its agents, fired Plaintiff for engaging in the protected activity of filing a complaint against it under the FLSA, in violation of 29 U.S.C. § 215(a)(3).

137.    Defendant's illegal acts have caused Plaintiff to suffer harm, injury, and damages.

## COUNT VIII
### Retaliation in Violation of G.L. c. 151, § 19(5)

138.    Plaintiff incorporates by reference all allegations made herein.

139.    It is illegal under G.L. c. 151, § 19(5) for an employer to take adverse actions against an employee for making a claim under G.L. c. 151, § 1A, the Massachusetts Overtime Law.

140.    By making claims under G.L. c. 151, § 1A in her Complaint, First Amended Complaint, and Second Amended Complaint ("the complaints"), Plaintiff engaged activity protected by G.L. c. 151, § 1A.

141.    Defendant, by its agents, knew that Plaintiff engaged in this protected activity including because it was served with Plaintiff's complaints.

142.    On September 9, 2022, after it had been served with the complaints, Defendant, by its agents, fired Plaintiff for engaging in the protected activity of filing a complaint against it under G.L. c. 151, § 1A, in violation of G.L. c. 151, § 19(5).

143.    Defendant's illegal acts have caused Plaintiff to suffer harm, injury, and damages.

## COUNT IX
### Retaliation in Violation of G.L. c. 151B, § 4(4)

144.    It is illegal under G.L. c. 151B, § 4(4) for an employer to take adverse actions against a person for filing a Charge of Discrimination under G.L. c. 151B, or making claims against it under G.L. c. 151B in court.

145.     In her Charge of Discrimination, First Amended Complaint, and Second Amended Complaint ("the complaints"), Plaintiff engaged in this protected activity by making allegations that Defendant had subjected her to adverse employment actions in violation of G.L. c. 151B.

146.     Defendant, by its agents, knew that Plaintiff engaged in this protected activity including because it was served with Plaintiff's Charge of Discrimination and complaints.

147.     Defendant, by its agents, knew that Plaintiff had engaged in these protected activities before it fired Plaintiff on September 9, 2022.

148.     Defendant, by its agents, fired Plaintiff on September 9, 2022, because she engaged in activities protected by G.L. c. 151B, in violation of G.L. c. 151B, § 4(4).

149.     Defendant's illegal acts have caused Plaintiff to suffer harm, injury, and damages.

150.     Plaintiff has satisfied all administrative prerequisites to suit under G.L. c. 151B. (Attachment B.)

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

A.     Judgment awarding Plaintiff's all unpaid wages, overtime wages, liquidated damages, treble damages, attorneys' fees and costs, including as mandated by 29 U.S.C. § 216(b), and G.L. c. 149, § 150;

B.     Judgment awarding her lost pay, damages for emotional distress, compensatory, punitive damages, liquidated damages, and attorney's fees, as provided by G.L. c. 151B, and any other applicable law.

C.     An award of pre- and post-judgment interest on all amounts awarded at the highest rate allowable by law; and

D.     All such other and further relief to which Plaintiffs may show themselves to be justly entitled.

## JURY DEMAND

A trial by jury is demanded on all counts so triable.

Respectfully submitted,

PLAINTIFF MARGERY KAIN,

By her Attorney,

s/Daniel W. Rice
Daniel W. Rice, BBO # 559269
Harrington, Rice & Maglione, LLC
738 Main Street
Hingham, MA 02043
(781) 964-8377 (mobile)
dwr@harringtonrice.com

Dated: December 6, 2022