## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MARGERY KAIN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 22-10436-RGS |
| ) | |
| LIBERTY MUTUAL GROUP INC., ) | |
| ) | |
| Defendant. ) | |
| ) | |

## DEFENDANT LIBERTY MUTUAL'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, Defendant Liberty Mutual Group Inc. ("Liberty Mutual" or the "Company") submit the following Statement of Undisputed Material Facts:

Ms. Kain's employment with Liberty Mutual

1. Liberty Mutual hired Ms. Kain on March 13, 2000 as an Executive Assistant ("EA"). **Declaration of Andrea Sullivan ("Sullivan Dec."), ¶ 4, Ex. A (Deposition of Margery Kain), 12:1-8.**

2. Ms. Kain was an EA for Liberty Mutual from March 13, 2000 until September 9, 2023. **Sullivan Dec. ¶ 4, Ex. A, 12:1-8.**

3. EAs are generally responsible for providing administrative support for executives, and exercising confidentiality, tact and diplomacy in doing so. This support includes, but is not limited to, managing executive calendars, preparing materials for meetings, triaging communications, coordinating and optimizing executive travel plans, and helping to keep executives focused and on schedule. **Declaration of Kathleen Jonas ("Jonas Dec.") ¶ 6; Sullivan Dec. ¶ 4, Ex. A, 19:18-23.**

4.    The essence of an EA's role is to enable the executives they support to be more productive with their time and to work as efficiently and effectively as possible. **Jonas Dec. ¶ 6; Sullivan Dec. ¶ 4, Ex. A, 19:24-20:14; 31:15-19.**

5.    In fulfilling the responsibilities of an EA, it is important that an EA displays a high degree of professionalism to maintain confidential information with discretion, deal with people tactfully and held build strong relationships and positive communication. **Sullivan Dec. ¶ 4, Ex. A, 20:18-21:5.**

6.    There are different levels of executives at Liberty Mutual. The highest level executive in the Company is currently Timothy Sweeney, the President and CEO of Liberty Mutual. An executive who reports to Mr. Sweeney is considered an L1 executive (*i.e.* one level removed from the CEO). An executive who reports to an L1 executive is considered an L2 executive (*i.e.* two levels removed from the CEO), and an executive who reports to an L2 executive is considered an L3 executive, and so forth. **Declaration of Shelby Thompson ("Thompson Dec.") ¶ 4.**

7.    Ms. Kain began supporting Mr. Enrique Huerta in September 2018. At that time, Mr. Huerta was an L2 and the head of Liberty Mutual's Global Retail Markets Transformation ("GRM") department. **Sullivan Dec. ¶ 4, Ex. A, 25:3-21.**

8.    Mr. Huerta relocated from Spain to Boston to begin his role in GRM for Liberty Mutual. **Sullivan Dec. ¶ 4, Ex. A, 26:24-27:8**.

9.    Ms. Kain was Mr. Huerta's first EA upon moving to Boston. **Sullivan Dec. ¶ 4, Ex. A, 27:3-8.**

10.    Mr. Huerta is commonly referred to as "Quique". **Sullivan Dec. ¶ 4, Ex. A, 34:2-6.**

11.     When Mr. Huerta first moved to Boston, he was not familiar with Boston, the Liberty Mutual Boston office or any of the people at Liberty Mutual. **Sullivan Dec. ¶ 4, Ex. A, 28:3- 31:14.**

12.     As a result, Ms. Kain spent a lot of time educating Mr. Huerta on who everyone was, how the office operated, how the technology worked, how to fill out various Liberty Mutual forms and have copies made. **Sullivan Dec. ¶ 4, Ex. A, 28:3- 31:14.**

13.     As Mr. Huerta was became more accustomed to Boston, Ms. Kain's responsibilities evolved to include heavy calendar management and making travel arrangements. **Sullivan Dec. ¶ 4, Ex. A, 28:3-31:4.**

14.     In early 2020, Mr. Huerta became the head of Global Employee Experience ("GEX"), a group within Liberty Mutual's Talent and Enterprise Services ("T&ES") department. **Sullivan Dec. ¶ 4, Ex. A, 25:24-26:12.**

15.     The T&ES department (now the People, Purpose and Brand department) is responsible for driving talent and organizational strategy at Liberty Mutual. Within T&ES, there were several sub-departments, including but not limited to Global Employee Experience ("GEX"), Environmental, Social, Governance ("ESG"), Global Total Rewards ("GTR") and Diversity, Equity and Inclusion ("DEI"). **Jonas Dec. ¶ 5.**

16.     Mr. Huerta's transfer to GEX occurred shortly before COVID. As a result, after making the transition, Ms. Kain's duties changed from doing extensive expense and travel work to ensuring that the GEX team had everything they needed to work remotely. **Sullivan Dec. ¶ 4, Ex. A, 31:20-33:22.**

17.     Ms. Kain supported Mr. Huerta until November 1, 2021. **Sullivan Dec. ¶ 4, Ex. A, 159:15-17; Declaration of Amber Bonlie ("Bonlie Dec.") ¶ 4.**

18.     For the most part, Ms. Kain enjoyed working with Mr. Huerta, got along well

with Mr. Huerta, and did not have any significant disagreements or conflicts with Mr. Huerta.

**Sullivan Dec. ¶ 4, Ex. A, 27:15-28:2.**

19.     While Ms. Kain supported Mr. Huerta, she did some personal tasks for him.

**Sullivan Dec. ¶ 4, Ex. A, 238:3-20.**

20.     Ms. Kain never complained to anyone at Liberty about doing personal tasks for

Mr. Huerta. **Sullivan Dec. ¶ 4, Ex. A, 220:1-11.**

<u>Liberty Mutual offers Ms. Kain Early Retirement</u>

21.     On September 1, 2020, Liberty Mutual notified Ms. Kain that she qualified for an

Early Retirement Offer ("ERO").  **Bonlie Dec. ¶ 6 (Exhibit B).**

22.     If Ms. Kain accepted Liberty Mutual's ERO by October 15, 2020, she would

receive $126,056.25. **Bonlie Dec. ¶ 6 (Exhibit B); Sullivan Dec. ¶ 4, Ex. A, 48:14-18.**

23.     On October 14, 2020, after seeing an email about Mr. Huerta moving back to

Spain, Ms. Kain asked Mr. Huerta whether there were going to be any changes to her role as his

EA. **Sullivan Dec. ¶ 4, Ex. A, 34:14-35:17.**

24.     Mr. Huerta responded by confirming that he was moving back to Spain, he did not

know the timing of his move, and as far as he knew he did not believe Ms. Kain's role would

change because he would be keeping his US hours and schedule. **Sullivan Dec. ¶ 4, Ex. A, 36:1-**

**37:24.**

25.     In January 2021, Mr. Huerta and Ms. Kain had another conversation about his

move to Spain, during which Mr. Huerta confirmed that his move back to Spain would be in

May or June of 2021. Mr. Huerta also stated that he did not foresee any changes to Ms. Kain's

role, with the exception of travel, since he would now be in Spain. **Sullivan Dec. ¶ 4, Ex. A, 50:18-54:22**.

26.     When this January 2021 conversation with Mr. Huerta occurred, Ms. Kain's ERO had already closed. **Sullivan Dec. ¶ 4, Ex. A, 55:20-23.**

<u>The T&ES EA group is identified for a reorganization</u>

27.     As of 2020, T&ES had more EAs than any other department at Liberty Mutual, and, similarly, more EAs than many of Liberty Mutual's peer companies. **Jonas Dec. ¶ 7.**

28.     As a result, the EA group in T&ES was identified for a reorganization. The reorganization was spearheaded by Senior Talent Advisor Kathleen Jonas. **Jonas Dec. ¶¶ 4 & 7.**

29.     Based on research performed by Ms. Jonas and her team, the decision was made to reorganize the T&ES EA group into a centralized model. **Jonas Dec. ¶ 8.**

30.     A centralized EA model would create substantial efficiencies for Liberty Mutual, and it had been effectively utilized in Liberty Mutual's legal and investment departments and had a track record of success. **Jonas Dec. ¶¶ 9-10.**

31.     Challenges are inherent in any organizational change. However, with the right person managing the EA group, Ms. Jonas believed that any short-term challenges would be outweighed by the long-term savings and other operational advantages. **Jonas Dec. ¶ 11.**

32.     In a centralized model, instead of one EA supporting one executive, all the EAs would be pooled into one group reporting to one EA Manager, and each EA would support multiple executives. **Jonas Dec. ¶ 9.**

33.     Jonas concluded that the centralized model would allow for more focus on EA development, team culture, process improvements and prioritization of work because the EAs

would gain experience supporting different executives and would learn from one another in a group setting. **Jonas Dec. ¶ 9; Sullivan Dec. ¶ 4, Ex. A, 62:17-63:2.**

34.    The centralized model would also cut annual costs in the T&ES department by $1 million. **Sullivan Dec. ¶ 4, Ex. A, 65:4-8; Jonas Dec. ¶ 10.**

35.    EA development, team culture, process improvements, the prioritization of work and cutting costs are all legitimate business concerns for a company. **Sullivan Dec. ¶ 4, Ex. A, 64:1-65:3.**

<u>The reorganization is implemented in stages</u>

36.    The reorganization to a centralized EA model occurred in three stages. First, Liberty Mutual updated and modernized the TE&S job descriptions and job grades. This process was internally referred to a "Project Moon". Second, because one EA would now be supporting multiple executives, under the new model there would be multiple EAs without assignments and Liberty Mutual would need to reduce the number of EAs in T&ES. Last, new initial alignments between EAs and executives were made. These last two steps were internally referred to as "Project Tulip". **Jonas Dec. ¶ 12.**

<u>Project Moon</u>

37.    In the beginning of 2021, the T&ES EA job description, which had not been updated in 17 years, was updated to restate and formalize Liberty Mutual's expectations and create standard objectives for a consistent baseline for evaluation. **Jonas Dec. ¶ 13.**

38.    While the core responsibilities of the EAs did not change, the terminology was updated to reflect the work EAs were currently doing, as the manner in which such work was conducted was different due to new technologies, new organizational structures and a "new normal" in the ways employees worked, including in a virtual environment. **Jonas Dec. ¶ 13.**

39.    In addition to updating the job description, the job grades (which is the way Liberty Mutual refers to levels of seniority) for the EAs, and the criteria necessary to move up job grades, were also revised to promote consistency in performance evaluations and promotions between the job grades. **Jonas Dec. ¶ 14.**

40.    As a result of updating the job grades, which involved eliminating a job grade (formally grade 11), some EAs were moved up a grade but none were moved down a grade. For non-managing EAs, the maximum grade was 13. **Jonas Dec. ¶ 14.**

41.    Once an EA reached grade 13 (and many had already reached that level), there were no opportunities to advance to a higher job grade without changing positions. **Jonas Dec. ¶ 14.**

42.    Ms. Kain was a grade 13 before (and after) the reorganization. **Jonas Dec. ¶ 14; Sullivan Dec. ¶ 4, Ex. A, 10-13; 143:6-144:20.**

<u>Project Tulip</u>

43.    After the job descriptions and grades were updated, in order to properly staff the EAs in the T&ES group, a reduction in force was implemented that resulted in 9 of 22 T&ES EAs losing their jobs. The layoffs were communicated in August 2021. **Sullivan Dec. ¶ 4, Ex. A, 65:23-66:7; Jonas Dec. ¶ 15.**

44.    Margery Kain was not laid off in this reduction in force. **Jonas Dec. ¶ 16; Sullivan Dec. ¶ 4, Ex. A, 66:8-9.**

45.    Before the reorganization, the T&ES EA group was 68% white and 50% over the age of 50. After the reorganization, these numbers increased to 69% and 61% respectively. **Bonlie Dec. ¶ 15.**

46.    Ms. Kain was not disadvantaged based on her age, race or national origin in connection with the reduction in force. **Sullivan Dec. ¶ 4, Ex. A, 77:19-78:5.**

47.     With 13 remaining EAs in the new T&ES structure, the centralized EA model (by design) would require each EA to shift to supporting multiple executives. As a result, executives were now responsible for doing some of the tasks that their EAs had previously done, including travel arrangements. The intent of the centralized model was that, over time, the EAs would rotate executives, learn new skills, and be able to support any executive at any time. **Jonas Dec. ¶ 17.**

48.     Ms. Jonas made the initial EA/executive alignments in the new centralized EA model. **Jonas Dec. ¶ 18.**

49.     In making the initial alignments, Ms. Jonas utilized what she believed was the path of least disruption, which meant, to the greatest extent possible, she tried to keep EAs aligned with their executives or at least their departments to avoid further business disruptions. **Jonas Dec. ¶ 19.**

50.     Ms. Jonas used this model—the path of least disruption—primarily for two reasons. First, the T&ES EA group had already undergone change, and the path of least disruption would minimize any additional disruptions while everyone adjusted to the new centralized model. Second, Liberty Mutual was hiring an EA Manger to supervise the T&ES EA group, and he or she would be responsible for assessing the initial alignments and making adjustments, as needed. **Jonas Dec. ¶ 19.**

51.     In order to determine the path of least disruption, beginning in June/July of 2021, Ms. Jonas and her team reached out to the T&ES executives to learn if any of their current EAs possessed unique skills or handled unique tasks that would cause a business disruption if that EA was realigned to a new executive. **Jonas Dec. ¶ 20.**

52.     During discussions with the executives, Ms. Jonas learned that EA Tonya Gloria had gained unique knowledge regarding the operations of Liberty Mutual's DEI department while supporting Dawn Frazier-Bohnert, an executive in Liberty Mutual's DEI department. **Jonas Dec. ¶ 21; Declaration of Tonya Gloria ("Gloria Dec.") ¶¶ 10-14.** This unique knowledge included familiarity with external contacts of the DEI group, paying invoices for a variety of outside vendors and contractors that were unique to the DEI environment, managing the DEI department's mailbox and arranging speaking engagements for Ms. Bohnert. **Jonas Dec. ¶ 21; Gloria Dec. ¶ 10-14**.

53.     At the time of the reorganization, Ms. Bohnert was an L2. **Gloria Dec. ¶ 3.**

54.     EA Tonya Gloria had been providing support to the DEI group and Ms. Bohnert since at least 2015. **Sullivan Dec. ¶ 4, Ex. A, 115:3-15; Gloria Dec. ¶ 4.**

55.     If an EA who had never supported the DEI group was newly aligned to Ms. Bohnert, that EA would need additional training to order to perform his or her responsibilities. **Jonas Dec. ¶ 21; Gloria Dec. ¶¶ 10-14.**

56.     Ms. Kain was never an EA in the DEI department. **Sullivan Dec. ¶ 4, Ex. A, 84:12-19; 86:13-16.**

57.     Ms. Kain believed there would be a six month to year learning curve for an EA who was aligned to a new department. **Sullivan Dec. ¶ 4, Ex. A, 113:16-19; 115: 3-15.**

58.     Ms. Kain concedes that she would have some learning curve if she had been assigned to support Ms. Bohnert in the reorganization. **Sullivan Dec. ¶ 4, Ex. A, 117:1-6.**

59.     Consistent with the path of least disruption, Ms. Jonas decided to keep Ms. Gloria aligned with Ms. Bohnert. Because Ms. Bohnert was paired with Mr. Huerta in the

reorganization, this meant that Ms. Gloria would also support Mr. Huerta. **Jonas Dec. ¶ 21; Gloria Dec. ¶¶ 5, 15.**

60.    At the time of the reorganization, Ms. Gloria was 43 years old and self-identified as Hispanic/Latino. **Gloria Dec. ¶¶ 17, 21.**

61.    Ms. Gloria was born in the United States. **Gloria Dec. ¶ 20.**

62.    In September 2023, after learning the identity of her biological father and undergoing genetic testing, Ms. Gloria self-identified as White. **Gloria Dec. ¶¶ 18-19.**

63.    Ms. Elaine Casamassima also provided support to the DEI department before and after the reorganization. **Sullivan Dec. ¶ 4, Ex. A, 86:19-87:18.**

64.    At the time of the reorganization, Ms. Casamassima was 52 years old and self-identified as White. **Bonlie Dec. ¶ 14.**

65.    Ms. Kain does not believe that Ms. Casamassima's age, race or national origin played a role in her remaining aligned with the DEI department. **Sullivan Dec. ¶ 4, Ex. A, 86:19-23; 135:4-8.**

66.    After the reorganization, Ms. Kain supported Don Roach, Patrick Breen, Maria Jose Tobias, Rakhi Kumar, and provided indirect support to Henry Veguilla and Daniel Antuccio. **Bonlie Dec. ¶ 4; Sullivan Dec. ¶ 4, Ex. A, 83:6-11.**

67.    Don Roach, Patrick Breen, Maria Jose Tobias, Rakhi Kumar, Henry Veguilla and Daniel Antuccio were L3 executives at the time of the reorganization. **Bonlie Dec. ¶ 4.**

68.    The initial alignments in the reorganization were not permanent; rather, the intent was to allow the EA Manager to get into his/her role and determine whether adjustments needed to be made. **Jonas Dec. ¶ 23.**

69.     In making the initial alignments, there was no consideration of the EA's performance ratings, nor was race, national origin or age considered. **Jonas Dec. ¶ 24.**

70.     The new centralized model was announced to the T&ES EAs in August of 2021 and became effective on November 1, 2021 **Jonas Dec. ¶ 26; Sullivan Dec. ¶ 4, Ex. A, 55:17-19; 173:8-14.**

71.     In October 2021, Liberty Mutual hired Shelby Thompson as the EA Manager for the T&ES EA group. **Jonas Dec. ¶ 25; Thompson Dec..**

72.     Once Ms. Thompson was hired, all of the T&ES EAs reported to Ms. Thompson. **Sullivan Dec. ¶ 4, Ex. A, 109:7-9.**

73.     The T&ES EAs who remained at Liberty Mutual after the reorganization, including Ms. Kain, continued to have the same (or higher):

    a.   Job title;

    b.   Job grade;

    c.   Salary;

    d.   Benefits and

    e.   Primary job functions.

**Sullivan Dec. ¶ 4, Ex. A, 102:7-23; 104:13-19; Jonas Dec. ¶ 27.**

<u>Ms. Kain is unhappy with the reorganization</u>

74.     Ms. Kain was unhappy about the reorganization and new centralized EA model. **Sullivan Dec. ¶ 4, Ex. A, 81:12-22; Bonlie Dec. ¶ 5.**

75.     On October 11, 2021, Ms. Kain expressed her unhappiness about the reorganization to Brett Trainer, the interim EA Manager. Ms. Kain told Mr. Trainer: "This will NOT be a 'smooth transition' for me" and "This is unfair and truly shows favoritism for the DEI

group and Elaine [Casamassima]." Ms. Kain made no mention of Tonya Gloria. **Sullivan Dec. ¶ 4, Ex. A, 79:2-83:15; Sullivan Dec. ¶ 8 (Exhibit E).**

76.     Ms. Kain was unhappy because she believed that the reorganization resulted in a demotion for her because (1) she believed she suffered a loss of prestige because she was no longer supporting an L2 executive, (2) she believed she had fewer job responsibilities and (3) she was now reporting to an EA Manager as opposed to an executive. **Sullivan Dec. ¶ 4, Ex. A, 106:1-108:19.**

77.     Ms. Kain believes that supporting L3 executives was less prestigious than supporting L2 executives because she believes that at Liberty Mutual "you are who you work for." **Sullivan Dec. ¶ 4, Ex. A, 105:13-24.**

78.     Ms. Kain was also unhappy about the change because, back in October 2021 and January 2021, Mr. Huerta told her he did not believe there would be any changes to her role when he moved to Spain. Ms. Kain now believes that Ms. Huerta's statement was a lie. **Bonlie Dec. ¶ 9; Sullivan Dec. ¶ 4, Ex. A, 40:3-41:17.**

79.     As a result of her unhappiness with the reorganization, Ms. Kain asked Liberty Mutual to reopen her Early Retirement Offer (ERO), which had closed on October 15, 2020. **Bonlie Dec. ¶ 5; Sullivan Dec. ¶ 4, Ex. A, 171:11-18.**

80.     Ms. Kain's request to reopen her ERO was reviewed by Amber Bonlie. **Bonlie Dec. ¶ 7.**

81.     During Ms. Bonlie's review, she learned that Mr. Huerta was not aware that Ms. Kain's role was going to change at the time he told her he did not believe her role would change when he moved to Spain. **Bonlie Dec. ¶ 10.**

82.    On October 12, 2021, Ms. Bonlie notified Ms. Kain of the outcome of her investigation—that ERO could not be reopened. **Bonlie Dec. ¶ 12; Sullivan Dec. ¶ 4, Ex. A, 171:11-172:8.**

83.    In response to Ms. Bonlie informing Ms. Kain that ERO could not be reopened, Ms. Kain indicated that she did not want a go-forward role and asked for a separation agreement. **Sullivan Dec. ¶ 4, Ex. A, 170:17-21; Bonlie Dec. ¶ 12.**

84.    Ms. Kain also told Ms. Bonlie that Ms. Gloria remaining aligned to Ms. Bohnert in the new centralized EA model was discriminatory because Ms. Gloria was younger and Latino. **Sullivan Dec. ¶ 4, Ex. A, 168:18- 170:7.**

85.    Specifically, Ms. Kain believed that Ms. Gloria remained aligned with Ms. Bohnert because it was her belief that "it looks good for a Latino admin to be the presence of DEI." **Sullivan Dec. ¶ 4, Ex. A, 111:8-14.**

86.    Ms. Kain also believes that she mentioned discrimination to Ms. Marisa Ghiorzi after learning about the reorganization. During the conversation, Ms. Ghiorzi asked Ms. Kain about her intentions in her go-forward role and Ms. Kain replied that she would perform as she always has. **Sullivan Dec. ¶ 4, Ex. A, 173:2-174:21.**

87.    Ms. Gloria and Ms. Jonas do not believe that the level of executive an EA supports reflects that EA's status or prestige within the Company. **Gloria Dec. ¶ 16; Jonas Dec. ¶ 28**.

<u>Ms. Kain initiates litigation</u>

88.    On November 11, 2021, Ms. Kain filed her MCAD Charge. **Sullivan Dec. ¶ 5 (Exhibit B).** She removed her Charge from the MCAD on March 31, 2021. **Sullivan Dec. ¶ 6 (Exhibit C).**

89.     On March 22, 2022, Ms. Kain filed her claims in federal court (the U.S. District Court, District of Massachusetts). **Sullivan Dec. ¶ 7 (Exhibit D).**

<u>Ms. Kain's 2021 Performance Review and Compensation Statement</u>

90.     On January 27, 2022, Ms. Thompson, the new EA Manager, had a meeting with Ms. Kain to deliver the results of her 2021 Performance Review. **Thompson Dec. ¶ 10.**

91.     Ms. Thompson was not aware of Ms. Kain's Charge, Complaint or any of the claims Ms. Kain is asserting against Liberty Mutual at any time while Ms. Kain was employed by Liberty Mutual. **Thompson Dec. ¶ 17; Sullivan Dec. ¶ 4, Ex. A, 178:14-18.**

92.     Ms. Thompson did not have any input into Ms. Kain's 2021 performance review rating. The rating was provided by the executives who Ms. Kain had supported during the 2021 year. **Thompson Dec. ¶ 10.**

93.     For 2021, Ms. Thompson was only responsible for entering the performance reviews into the system and discussing the reviews with each of the EAs, including Ms. Kain. **Thompson Dec. ¶ 10.**

94.     Even though Ms. Kain received feedback from her executives that she was very disengaged and doing the bare minimum work during the second half of 2021, Ms. Kain received an "exceeds expectations" performance rating for 2021. **Thompson Dec. ¶ 11; Sullivan Dec. ¶ 4, Ex. A, 158:20-24, 161:22-162:5.**

95.     On February 28, 2022, Ms. Thompson met with Ms. Kain to discuss her merit compensation and variable incentive plan. Even though Ms. Kain's salary had been maxed out at

her paygrade (*i.e.* could not receive a merit salary increase), she received a one time $550 salary adjustment. **Thompson Dec. ¶ 12.**[1]

Ms. Kain receives the exact assignment she requested

96.    Beginning in October 2021, Ms. Thompson met with Ms. Kain on a monthly (and sometimes more frequently) basis. **Thompson Dec. ¶ 9.**

97.    The first time Ms. Kain complained to Ms. Thompson about who she was supporting was on May 4, 2022 during a one-on-one meeting. **Thompson Dec. ¶ 13**.

98.    During that May 4, 2022 one-on-one meeting, Ms. Kain told Ms. Thompson that her role was not fulfilling and "the level of Executive you support matters." **Thompson Dec. ¶ 13.**

99.    On June 8, 2022, Ms. Thompson asked Ms. Kain for a list of the executives she would like to support. **Thompson Dec. ¶ 14; Sullivan Dec. ¶ 4, Ex. A, 184:22-185:3.**

100.    On June 8, 2022, Ms. Kain provided Ms. Thompson with a list of the executives she would like to support. The list included Monika Cox, who was an L2 level executive. **Thompson Dec. ¶ 15; Sullivan Dec. ¶ 4, Ex. A, 184:22-185:9.**

101.    On June 16, 2022, Ms. Thompson announced that Ms. Kain would now be supporting Monika Cox. **Thompson Dec. ¶ 16; Sullivan Dec. ¶ 4, Ex. A, 183: 5-7.**

102.    By realigning Ms. Kain to support Ms. Cox, Ms. Kain got the alignment she specifically requested and corrected what she was thought was a mistake with the initial alignment that was announced in August of 2021. **Sullivan Dec. ¶ 4, Ex. A, 185:9-13.**

---

[1] Ms. Kain is not claiming (and cannot claim) that the salary cap that applied to her and all other EAs who had reached a job grade 13 was discriminatory based on her age, race or national origin. **Sullivan Dec., ¶ 4, Ex. A, 144:21-145:1.**

103.    Ms. Kain was happy with the June 16, 2022 realignment that resulted in her supporting Ms. Cox. **Sullivan Dec. ¶ 4, Ex. A, 187:5-9**.

<u>Ms. Kain's employment is terminated for violating Liberty Mutual's Behavior Expectations and Workplace Violence policies</u>

104.    After Ms. Kain filed this litigation, Liberty Mutual started the process of preserving and pulling all of her internal electronically stored documents, which is standard practice for Liberty Mutual. **Sullivan Dec., ¶ 9 (Exhibit F).**

105.    In connection with that process, Liberty Mutual's legal department, which is responsible for the document preservation and extraction process, identified a number of emails and chats written by Ms. Kain that were of a concerning nature.  As a result, the department turned over those emails and chats to the Company's Employee Relations Department. **Sullivan Dec., ¶ 9 (Exhibit F).**

106.    In August of 2022, Rachel Domzal, Director of Global Employee Relations & Talent Practices, provided Ms. Kain's communications to Tara Michalowski, Senior Employee Relations Consultant, and asked her to conduct an investigation and determine whether any of the communications violated Company policy. **Declaration of Tara Michalowski ("Michalowski Dec.") ¶ 4-5.** Ms. Domzal asked Ms. Michalowski to conduct the investigation because Ms. Michalowski had no knowledge of any of Ms. Kain's legal claims or her lawsuit. Ms. Domzal did not inform Ms. Michalowski of Kain's claims or the lawsuit against Liberty Mutual, nor did she suggest what the outcome of the investigation should be.  **Sullivan Dec., ¶ 9 (Exhibit F).**

107.    On August 23, 2022, Ms. Michalowski had a call with Ms. Kain. Krista Hertel, also of Employee Relations, was also present, taking notes. **Sullivan Dec. ¶ 4, Ex. A, 190:2-191:17; Michalowski Dec. ¶ 7.**

108.    During the August 23, 2022 call, Ms. Kain was asked about a number of communications. Ms. Kain confirmed that she had sent each of the messages. **Sullivan Dec. ¶ 4, Ex. A, 194: 15-20; Michalowski Dec. ¶ 9.**

109.    On September 8, 2022, Ms. Michalowski had another call with Ms. Kain. Ms. Hertel was again present and taking notes. **Sullivan Dec. ¶ 4, Ex. A, 194:21-195:14; Michalowski Dec. ¶ 8.**

110.    During the September 8, 2022 call, Ms. Kain was asked about a number of additional communications. Ms. Kain confirmed that she had sent each of the messages. **Sullivan Dec. ¶ 4, Ex. A, 195:18-24; Michalowski Dec. ¶ 9.**

111.    Liberty Mutual's Behavior Expectations policy provides that employees are expected to always exhibits appropriate behavior, a high degree of integrity, treat others with respect and observe Company policies, procedure and safety rules. **Michalowski Dec. ¶ 10 (Exhibit B); Sullivan Dec. ¶ 4, Ex. A, 192:15-24; 193:10-12.**

112.    Liberty Mutual's Workplace Violence policy provides that Liberty Mutual is committed to providing a safe and secure workplace that is free from acts or threats of violence. Threats to the safety of an employee are prohibited regardless of whether they are made directly or indirectly through oral or written communication, gestures or symbolic acts. **Michalowski Dec. ¶ 10 (Exhibit C); Sullivan Dec. ¶ 4, Ex. A, 193:13-19.**

113.    Ms. Michalowski found that a number of Ms. Kain's communications were disrespectful, inappropriate for the workplace and violated Liberty Mutual's Behavior Expectations policy. Among these communications are Ms. Kain referring to various colleagues as "nitwits", a "nut", a "coward", a "crack TA, "useless", "idiots", Ms. Kain referring to another colleague as "prostituting herself out" and "kissing all their asses", Ms. Kain celebrating that her

former boss (Mr. Huerta) had lost his job and wishing him "nothing but misery for the rest of his days" and referring to him as the "sleaziest person" she has ever known, and Ms. Kain stating that she wanted to see another colleague "sink". **Michalowski Dec. ¶ 11.**

114.    Ms. Michalowski also found that a number of Ms. Kain's communications violated both Liberty Mutual's Behavior Expectations policy and Workplace Violence policy. These communications included Ms. Kain telling a colleague that she was going to go out in a "blaze of glory" when she left Liberty Mutual; Ms. Kain telling another colleague that she understood why people "go postal" at work; and Ms. Kain telling another colleague that she wanted to feed her former boss "some bad food" and watch him "choke on his food". **Michalowski Dec. ¶ 12.**

115.    Ms. Michalowski made the decision to terminate Ms. Kain's employment because, in addition to their content, the quantity of communications that violated company policies was overwhelming, especially for an employee who interfaces with the highest-level executives on a daily basis. **Michalowski Dec. ¶ 17.**

116.    Ms. Michalowski's decision to terminate Ms. Kain's employment was made without Ms. Domzal's input or input from Ms. Kain's manager. **Michalowski Dec. ¶ 17.**

117.    On September 9, 2022, Ms. Michalowski met with Ms. Kain via call to let her know that her employment was being terminated because her behavior (which had been discussed during the prior meetings), violated the Behavior Expectations and Workplace Violence policies. **Sullivan Dec. ¶ 4, Ex. A, 207:24-208:9; Michalowski Dec. ¶ 18.**

118.    At the time Ms. Michalowski was asked to investigate Ms. Kain's emails, Ms. Michalowski did not know Ms. Kain had a lawsuit against Liberty Mutual. **Michalowski Dec. ¶ 19.**

119.    Ms. Kain made comments about a lawsuit against Liberty Mutual during Ms. Michalowski's investigatory interviews of her. Ms. Kain did not provide any details about her "lawsuit" and Ms. Michalowski never learned whether Ms. Kain's comments were true until she was noticed for her deposition. Ms. Michalowski did not know anything about Ms. Kain's claims until after Ms. Kain's termination. **Michalowski Dec. ¶ 19.**

120.    The fact that Ms. Kain had a lawsuit against Liberty Mutual played no role in the decision to terminate her employment. **Michalowski Dec. ¶ 20.**

<u>No Evidence of Discrimination</u>

121.    No one in management or HR ever made any negative comments about Ms. Kain's age. **Sullivan Dec. ¶ 4, Ex. A, 139:21-24; 140:14-19.**

122.    No one in management or HR ever made any negative comments about Ms. Kain being from Boston. **Sullivan Dec. ¶ 4, Ex. A, 140:1-6.**

123.    No one in management or HR ever made any negative comments about Ms. Kain being white. **Sullivan Dec. ¶ 4, Ex. A, 140:8-19.**

124.    Ms. Kain is not aware of any documents stating anything negative or disparaging about her race, age or national original. **Sullivan Dec. ¶ 4, Ex. A, 140:20-141:1.**

125.    Ms. Kain "[has] no facts" to suggest that Liberty Mutual treated Ms. Gloria more favorably that Ms. Kain based on her national origin**. Sullivan Dec. ¶ 4, Ex. A, 138:14-18.**

126.    There is no evidence that Liberty Mutual treated similarly situated EAs in TE&S who engaged in similar misconduct of the nature that Ms. Kain engaged in more favorably than Ms. Kain. **Sullivan Dec. ¶ 4, Ex. A, 208:6-9.** In fact, Liberty Mutual has been unable to identify a similarly situated employee in TE&S who engaged in similar misconduct such at that engaged in by Ms. Kain as outlined in Paragraphs 113-114. **Sullivan Dec., ¶ 9 (Exhibit F).**

127.    Other than asserting that other EAs were terminated for raising complaints because "that is what they [Liberty Mutual] do," Ms. Kain did not identify any basis for her claim that Liberty Mutual terminated her employment in retaliation for the complaints she had raised. **Sullivan Dec. ¶ 4, Ex. A, 210:24-212:10.**

128.    Ms. Kain believes Liberty Mutual terminates employees who file complaints because she is aware of two EAs who raised complaints and then "disappeared" from the Company. **Sullivan Dec. ¶ 4, Ex. A, 210:24-212:10**. Ms. Kain's knowledge that these two EAs lodged complaints is based on hearsay. **Sullivan Dec. ¶ 4, Ex. A, 215:20-216:21**. Ms. Kain's knowledge that these two EAs were terminated is based on nothing more than her assumption because "you don't complain to HR and then walk off a job." **Sullivan Dec. ¶ 4, Ex. A, 215:2-7.**

Respectfully Submitted,

**LIBERTY MUTUAL GROUP INC.**

By its counsel,

*/s/ Andrea M. Sullivan*
Mark H. Burak (BBO #558805)
Andrea M. Sullivan (BBO #)
OGLETREE, DEAKINS, NASH, SMOAK
  & STEWART, P.C.
One Boston Place, Suite 3500
Boston, MA 02108
Telephone: (617) 994-5700
Facsimile:  (617) 994-5701
mark.burak@ogletree.com
andrea.sullivan@ogletree.com

Date: December 13, 2023

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 13, 2023, this document filed through the Court's electronic filing system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

<u>*/s/ Andrea M. Sullivan*</u>
Andrea M. Sullivan

59622494.v1-OGLETREE